Moncure, P.,
delivered the opinion of the court.
The sixth and last assignment of error in this case is the first which will be disposed of, viz : “ That the accused should have been sent to an examining magistrate before being placed on his trial.”
This is the same question which was presented by the first bill of exceptions taken by the accused on his first trial in this case, and this court being equally divided in opinion upon it when the case was formerly before us, the judgment of the court of Hustings- thereon was *825 therefore affirmed. Chahoon's Case, 20 Gratt. 733, 788. That affirmance was in pursuance of the Code, p. 841, § 7, ch. 209, Acts of Assembly 1866-'67, p. 937, which requires an affirmance “in those cases where the voices on both sides are equal,” and which applies as well to any ruling of the court below in the progress of the cause therein, as to the final judgment of the said court in the case. This question having thus already been decided by this court, the decision is final and irreversible, and could not be changed even if the court were now disposed to change it; as is not the case.
We will now proceed to consider the other assignments of error, in the order in which they are made. In regard to the first three, they present questions which properly ought to have been raised, if at all, before pleading to the indictment, but which are now raised for the first time in this court, on the present writ of error, unless they were embraced in the motion in arrest of judgment which was made in the court below. Without deciding whether or not it be now too late to raise these questions, and conceding, for the purposes of this case, that they are presented in due time, how ought they to be answered Í And,
1st. That the Hustings court of the city of Richmond had no jurisdiction of the case.
This assignment of error is based upon section 14 of article 6 of the constitution, (Acts of Assembly 1869-’70, p. 622,) which declares that, “for each city or town, in the State containing a population of five thousand, shall be elected, on the joint vote of the two houses of' the General Assembly, one city judge, who shall hold a Corporation or Hustings court of said city or town, as often, and as many days in each month, as may be prescribed by law, with similar jurisdiction which may be given by law to Circuit courts of this State, and shall hold his office for a term of sis years,” &c.
It is argued that this is the only provision of the con *826 stitution which prescribes the jurisdiction of a Corpora- • m ^ion or Hustings court; that this requires it to be similar *b&t may be given by law to the Circuit courts ; that the constitution does not prescribe the jurisdiction of the Circuit courts, but declares that it “shall be regulated by law Art. 6, § 1; that the Circuit courts have not had, since the adoption of the constitution, any jurisdiction for the trial of felonies, except in the single case of election by the accused (which is not this case), and that, therefore, the Hustings court can have no such jurisdiction.
This is plausible, but we think not a sound, argument. It places too strict and literal a construction on the words, “with similar jurisdiction which may be given by law to the Circuit courts of this State.” We,think the constitution ought to he construed like other instruments; ■that is reasonably, and with a view to effectuate the manifest intention of the framers of the instrument. It would certainly be a most unreasonable and inconvenient construction of the Constitution, to say that it gives to a Corporation or Hustings court similar, and only similar jurisdiction to that which may be given by law to the Circuit courts. According to that construction, such court was at once invested by the constitution, proprio vigore, with similar jurisdiction to that which the Circuit courts then exercised, and will have, ipso facto, and eo instanti, similar jurisdiction to that which may, at any time thereafter, be conferred by law upon the Circuit courts. Hot the same jurisdiction, but similar jurisdiction ; and as similis non est idem, we would have, according to this construction, in every case of jurisdiction exercised by a Corporation or Hustings court, to ■determine whether it was similar to jurisdiction given by law to the Circuit courts. It is unreasonable to suppose that the framers of the constitution intended so great an absurdity.
We think that the words under consideration : ‘ ‘ with. *827 similar jurisdiction which may be given by law to the Circuit court's,” were intended to bo an extension, and not a restriction of jurisdiction ; to elevate the Corporation and the Hustings courts, to the grade and dignity of Circuit courts ; and not to take away from them any jurisdiction which they then had, nor to render them incapable of being invested with any jurisdiction which the Legislature, in its wisdom, might see fit to give them. According to the judicial system which had existed under former constitutions, the judicial power of the State had been entrusted to three grades of courts ; the Supreme Court of Appeals, the Superior or Circuit courts, and the County or Corporation courts; a modified right to appeal being given from the third to the second, and from the second to the first class of the courts, in that order of gradation. The framers of the present constitution intended to preserve and continue, in the main, the same judicial system, and the same order of gradation. But believing, no doubt, that the judges of the Coi’poration or Hustings courts would generally be as learned in the law as judges of the Circuit courts, they therefore raised the former to the level of the latter courts, by declaring that they should have similar jurisdiction. They thought it unnecessary to say anything about the continuance of the jurisdiction which the Corporation or Hustings courts then had, and which, of necessity, they must continue to have, as no other courts were provided to receive it. They intended that the Corporation or Hustings courts should continue to bear the same relation to the cities and towns as the County courts bore to the counties, and that, in addition to that, the Corporation or Hustings courts should have similar jurisdiction with the Circuit courts; in other words be of the same grade with the Circuit courts, so that an appeal would lie directly from the Corporation or Hustings courts to the Supreme Court of Appeals.
That this is the true construction of the constitution *828 is also shown by the contemporaneous exposition of it by the Legislature which assembled immediately after its adoption, and organized the departments of government' according to its provisions. The 7th section of the act approved April 2, 1870, entitled “ An act to prescribe and define the jurisdiction of the county and corporation courts of the Commonwealth, and the times and places of holding the same,” Acts of Assembly, 1869-70, p. 36, provides “that the several Corporation courts of this State shall, within their respective limits, have the same jurisdiction as the Circuit courts; and the same jurisdiction as County courts over all offences committed within their limits ; and such other jurisdiction as may be conferred upon them by law : provided that the provisions of this section shall not apply to the courts of the city of Richmond.” The 4th section of the act approved April 7, 1870, entitled ‘ ‘ An act providing for courts for the city of Richmond, and defining the jurisdiction thereof,” id. p. 43, provides that “the Hustings court of the city of Richmond shall (except as hereinbefore provided) have exclusive original jurisdiction of all presentments, informations and indictments for offences committed within the jurisdiction aforesaid, including criminal causes now therein pending.” And the 7th section of the same act provides, that ‘ ‘ appeals, writs of error and writs of supersedeas from and to judgments, decrees and orders of the said Hustings court, and the said Chancery court' of the city of Richmond, shall be taken and allowed as if they were from or to those of the Circuit court or a circuit judge.” Thus, under the constitution and under these acts, the Corporation or Hustings courts in regard to crimes committed within their respective cities or towns, are invested with all the jurisdiction with which* both the County and Circuit courts of the counties are-invested, in regard to crimes committed in said counties respectively. In Boswell's case, 20 Gratt. 860, it was held that a prisoner indicted in a Corporation court for *829 murder, is not entitled to elect to be tried in the Circuit court; the act of April 27, 1867, Sess. Acts, 1866-67, ,p. 931, being altered in this respect by the act of April 2, 1870, aforesaid. And that case and the cases of Bird and Smith, decided at this term, all proceed upon the tacit admission of the existence of the jurisdiction, which is now for the first time questioned. If such jurisdiction do not exist, then there is none in any court for the trial of crimes committed in the cities and towns of the State.
■We are therefore of opinion that the Hustings court of the city of Richmond had jurisdiction over the case.
2d. The next assignment of error is, “ that if it had a general jurisdiction in cases of felony, it had no authority by law to impanel a grand jury at the time the supposed indictment was found against him.”
Chapter 206 of the Code, entitled “ Of grand juries,” provided for the summoning of grand juries in all the courts of criminal jurisdiction. That chapter, among others, was revised and amended by an act passed April 27, 1867, entitled “An act to revise and amend the criminal procedure.” Acts of Assembly, 1866-67, p. 925. That act was in force when the present constitution was adopted, and when the act of April 7, 1870, was passed, providing for courts for the city of Richmond, and among others the Hustiugs court. Acts of Assembly, 1869-70, p. 42. The fourth section of that act having, as before stated, given to the said Hustings court exclusive original jurisdiction of all presentments, informations and indictments for offences committed within the jurisdiction aforesaid ; and there being no other law then in existence providing for a grand jury but the act of April 27, 1867, aforesaid, it follows as matter of necessity, that that act should apply to the case. How else could the Hustings court exercise the jurisdiction expressly and exclusively given to it by the fourth section of the act of April 7, 1870, as aforesaid ? Is it not_a firmly settled canon of construction, that when *830 ever a power is expressly given, all powers necessary to execution, are given by necessary implication? But tbe act of April 27, 1867, neyer was repealed, and it applies in express terms to the Corporation court of Richmond, providing for a grand jury at the term of said court in May among other terms. The courts provided for by the fourteenth section of article 6 of the constitution, are continuations and successions of corporation courts then in existence, invested with the same jurisdiction and powers, subject to such modifications and changes as were made by the constitution, or might be made by any act thereafter passed. But if there were any doubt upon the subject, the first and fourth sections of the schedule to the constitution would continue the existence of the grand juiy law until otherwise provided.
The only doubt, if any, existing in this case, arises from tbe act passed May 18, 1870, entitled “ An act authorizing Hustings court, city of Richmond, to impanel a grand jury,” &c. Acts of Assembly, 1869-70, p. 111. That act makes a change in the terms of the court to which a grand jury is required to be summoned, and was necessary for that purpose. But the most that can be said of it is, that it is a cumulative law, passed from abundant caution, and not at all in conflict with the continued existence of the act of April 27, 1867, except so far as it altered the same.
We are therefore of opinion., that the Hustings court of the city of Richmond had authority by law to impanel a grand jury at the time the indictment wras found against the accused, to wit: on the- 4th day of June 1870, and also at the time the grand jury which found the said indictment was sworn, to wit: on the 2d day of May 1870.
3d. The next assignment of error is, “ that the said supposed indictment was found on the 4th day of June 1870, at a period when the said court of Hustings had no authority to hold its sessions.”
*831 The question presented by this assignment of error, depends upon the true construction of section 14 article 6 aforesaid, which directs a Corporation or Hustings court to be held “ as often, and as many days in each month, as may be prescribed by law.”(i;; The act of April 7, 1870, aforesaid, Acts of Assembly 1869-70, p. 44, § 10, provides, that “ there shall be a term of the Hustings court of the city of Biehmond for each month in the year, commencing on the first] Monday in the month, and continuing so long as the business before the court may require.” The term at which the indictment in this case purports to have been found, commenced on the first Monday in May 1870, and the indictment was found on the 4th day of June 1870; which was, it seems, the Saturday next before the first Monday in that month. It is argued that the term commencing in May could not be continued into June, but only for as many days in May “as may be prescribed by law;” the words of the constitution being, “ as often and as many days in each month as may be prescribed by law.”
We do not think that this isa reasonable construction of the constitution. We think its framers contemplated that there should be at least one term of the Corporation or Hustings court in each month, and intended to authorize such court to be held oftener than once in a month, if deemed proper by the Legislature. Corporation courts, like County courts, had always been held once a month. The constitution expressly provides that County courts shall be held monthly, and there is no reason to believe that its framers intended that Corporation courts might be held less frequently than they and County coui’ts had always been held before, and than County courts were expressly required to be held thereafter. It was probably supposed that the police business of the cities and towns, or some of them, might require that their Corporation courts should sit oftener than once a month, and, therefore, the Legislature is authorized so *832 to provide, if deemed proper. The words, “ so many days in each month,” seem to indicate an intention that there should be at least one term in each month. No doubt it was contemplated that, generally, if not in all cases, -the law would provide thereafter as it had provided theretofore, for monthly sessions of those courts. Accordingly, the act of April 7, 1870, providing for courts for the city of Richmond, declares that there shall be a term of the Hustings court of said city for each month in the year. Acts of Assembly 1869-’70, p. 44, § 10. That act also declares that the said term shall commeuce on the first Monday in the month, and continue so long as the business before the court may require. So that, according to the literal terms and obvious meaning of thatact, a term may continue from the day of its commencement, on the first Monday in a month, until the first Monday in the next succeeding month, if the business before the court require it. There is nothing in the words, “ for each month in the year,” which requires a term commencing on the first Monday in May, to continue only during the same month of May. The term for the month of May, consistently with the words and obvious meaning of the act, may continue into June, and until the first Monday in that month, if •the business before the court require it. Nor is this construction inconsistent with the- 14th section of .the 6th article of the constitution. The words, “ as many days in each month as may be prescribed by law,” in that section, do not refer to the calendar month in which a term may commence, but to the judicial month, commencing from the day in one calendar month, and continuing to the day in the next calendar month, fixed by law for the commencement of the monthly term of the court. Suppose the day fixed by law for the commencement of the monthly term of the Hustings court of the city of Richmond, were the last day of each month, ■instead of the first Monday in the month, is it *833 possible that the framers of the constitution could have intended that in such a case the court should sit but one day ? Or can it be supposed they intended that all the Corporation courts of the State should commence early in each month, in order that there may be time enough, during that calendar- month, to transact all the business before the court ? ¥e think not.
We are, therefore, of opinion that when the indictment was found, on the 4th day of June 1870, the said court of Hustings had authority to hold its sessions.
4th. The next assignment of error is, “that the court had no authority to send away, out of its jurisdiction, for a jury, the emergency contemplated by the statute not having arisen.”
This assignment of error is founded on the first of the only two bills of exceptions taken in the court below, on the last trial of the case. The law under which the court acted, in the proceeding here complained of, is the 10th section of chapter 208 of the Code, as revised and amended in the act passed April 27,1867, entitled “ An act to revise and amend the criminal procedure,” Acts of Assembly, 1866-67, p. 933, which provides that “in a criminal case, if qualified jurors not exempt from serving, cannot be conveniently found in the county or corporation in which the trial is to be, the court may 'cause so many as may he necessary of such jurors, to be summoned from auy other county or corporation, by the sheriff or sergeant thereof, or by its own officer.” In the exercise of the power conferred by this law, the court of trial must of necessity have a great deal of discretion, and the appellate court, in revising the judgment, ought not to reverse it for error in this respect, unless it be plain that such discretion has been improperly used. All the facts on which the proceeding here complained of was founded are set out in the bill of exceptions, and without repeating or commenting specially upon them, it is sufficient to say that it does not appear to us that the Hustings *834 court was not well warranted in that proceeding by the aforesaid. The sergeant of the city, hi. M. Lee, testified, “that certainly a jury could not begotten with convenience in Richmond, and he believed it was impossible ;” and the deputy sergeant, Thomas U. Dudley, testified, “ I have been sergeant and deputy sergeant of Richmond about ten years, and am accustomed to summoning jurors. It would be inconvenient to get a competent jury in this case ; and I think it would be impossible.” And both of them gave the reasons for the opinions they expressed. We are therefore of opinion that the Hustings court did not err in sending for a jury to the corporations of Fredericksburg and Lynchburg. Wormeley's case, 10 Gratt. 658, 672-3.
After the decision of the court to send elsewhere fora jury had been made, a motion was made by the accused for a change of venue ; which motion was overruled by the court”; and he excepted. This exception is embraced in the same bill of exceptions taken to the decision just referred to. The matter of it is not a subject of any of the assignments of error, and it is sufficient to say in regard to it, that we think there is no error in the judgment of the court below in that respect. See Wormeley’s case, supra.
5th. The next and last assignment of error to be noticed is, “ that the testimony of John Lyon, as rebutting evidence to the testimony of R. S. Sanxay, was improperly excluded.”
This assignment of error is based on the second and only remaining bill of 'exceptions taken in the court below on the last trial of the case ; and as it was the one chiefly relied'on by the learned counsel of the accused, in their argument in this court; and is the only one about which we have had any doubt or difficulty ; it seems to be proper to repeat, substantially, the facts as set out in the bill of exceptions, which is short, and contains no superfluous matter. “ After the Common *835 wealth had introduced testimony tending to show that the paper alleged to have been forged, set out in indictment, had been knowingly uttered and employed as true by the accused, and that the said paper had been sued upon in the County court by the accused, and that a bill in chancery had been filed by him in the Circuit court of Henrico upon the judgment obtained in the County court, to charge the real estate of Solomon Haunstein, and a decree obtained in that court for the sale of the said real estate, and the application of the proceeds thereof by the commissioner, R. L>. Sanxay, to the payment of the said judgment; and after a receipt in the following words : * Received of R. D. Sanxay, special commissioner, the sum of forty-nine hundred and ninety-six dollars and ninety-four cents,[in part satisfaction and discharge of the judgment obtained in Henrico County court, at March term 1867,lin favor of ¥m. Gleason, assignee of John W. Thompson,[against Richard D. Sanxay, curator of the estate of Solomon Haunstein, dec’d. Geo. Chahoon, attorney for ¥m, Gleason, assignee of Jno. ~W. Thompson;’ had been introduced in evidence by the Commonwealth,[as the receipt given by the accused, as counsel, to said commissioner, the Commonwealth then called_R. S. Sanxay, a son of said commissioner, who testified that the accused, in the office of J. H. Sands, where he and the witness and Sands (all of whom were then under a joint indictment for conspiracy to defraud the estate of Haunstein, and were also then finder several indictments[for the forging and uttering of said paper named inr the indictment in this case) had met with their counsel for conference in said cases, except the counsel for the "accused, who was absent; John M. Gregory, Esq., beingjpresent, representing Sands, and John Lyon, Esq., present, representing Sanxay; that in that [conference, the accused had been asked by him (Sanxay) whether he intended to deny that he had received the money receipted for in *836 the receipt given to said commissioner (hereinbefore set aad that the accused replied that he had not, and would not deny it. Whereupon the accused introduced the said John "Lyon, Esq., and. informed him of the testimony of said Sanxay, and proposed to examine him touching the statements testified to by the said E. 8. Sanxay for the Commonwealth, and asked said Lyon what response the accused gave to the question of said Sanxay, and whether he did not make a reply different from that testified to by said Sanxay. Whereupon the said Lyon, insisting that the knowledge and facts coming to him in said conference, and the reply to said question, came in the interview aforesaid, while he represented Sanxay as counsel, and that he considered all that passed there as passing under the seal of professional confidence, and that he claimed the privilege of counsel, and declined to answer the said question, unless released from his obligation by said Sanxay. Whereupon the accused asked that the court would require the said Lyon to answer said question.” But the court refused to do so.
There is no rule of law better settled than “that a counsel, solicitor or attorney shall not be permitted to divulge any matter which has been communicated to him in professional confidence.” In these words is the rule laid down in 2 Starkie on Evidence, page 395 ; and that excellent law writer further says: “This is the privilege of the client, and is founded on the policy of the law, which will not permit a person to betray a secret which the law has entrusted to him.” “With respect to such communications, the mouth of the witness is forever sealed, and he cannot reveal them at any time, or in any proceeding, although the client be no party to it, however improbable it may be under the circumstances, that any injury can result to him from the disclosure, and although the relation of attorney and client has ceased by the dismissal of the attorney.” To the same *837 effect is the rule laid down iu 1 Phillips on Evidence, 106 and seq., and 1 Greenleaf on Evidence, § 237 and seq. The decisions to be found on the subject, both in the English and American imports, are almost countless in number ; though it is somewhat remarkable, that there has been scarcely a case in this court in which the subject has ever been referred to. But it does not at all follow, that the rule, thus firmly established elsewhere, has not also prevailed in this State. On the contrary, we believe it has been always accepted and acted on here. Learned judges in England, have differed as to the wisdom and policy of the rule, and also as to the apparent exceptions to it, but not at all as to its existence. Perhaps no judge has laid down the rule, and apparent exceptions to it, more fully or luminously than has Lord Brougham, in two cases, Bolton v. Corporation of Liverpool, 1 Mylne and Keen 88; and Greenough v. Gaskell, Id. 98, (6 Cond. Eng. Ch. R. pp. 511 and 516,) aud especially the latter case, in which most of the main cases theu existing, to wit: in 1833, were cited and commented upon. That case was argued by counsel of the greatest distinction, among whom was Sir Edward Sugden, Mr. Pepys, afterwards Lord Cottenham, and Mr. Spence, the great equity law writer. It was decided by a judge of distinguished ability, who, though perhaps not so learned a lawyer as some others who have graced the profession iu England, yet, when he applied his great mind to any subject, as he did to the subject of that case, was sure to illustrate andadora it. We are told, too, that in that decision he was assisted by consultation with Lord Lyndhurst, Tindal, C. J., and Parke, J., 4 Barn. & Ad. 876, than whom England can boast of no greater judges; and the case has been since referred to and relied on as settling the law on this subject. 2 Mees. & Welsb. 100; 15 Jur. 1117; 16 Jur. 30, 41—43, part 2d. We may therefore safely and fairly accept that case as a sound exposition of the rule, and the reason of it. *838 “To force from the party himself,” says the lord ehanin the case, “the production of communications by him to professional men, seems inconsistent with the possibility of an ignorant man safely resorting to professional advice, and can only be justified, if the authority of decided cases warrants it. But no authority sanctions the much wilder violation of professional confidence, and in circumstances wholly different, which would be involved in compelling counsel, or attorneys, or solicitors, to disclose matters committed to them in their professional capacity, and which, but for their employment as professional men, they would not have become possessed of.” “If, touching matters that eome within the ordinary scope of professional employment, they receive a communication in their professional' capacity, either from a client or on his account, and for his benefit in the transaction of his business, or, which amounts to the same thing, if they commit to paper, in the course of their employment on his behalf, matters which they know only through their professional relation to the’client, they are not only justified in withholding such matters, but bound to withhold them, and will not be compelled to disclose the information, or produce the papers, in any court of law or equity, either as party or as witness.” The foundation of the rule “is out of regard to the interests of justice, which cannot go on without the aid of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations, which form the subject of all judicial proceedings. ' If the privilege did not exist at all, everyone would be thrown upon his own legal resources ; deprived of all professional assistance, a man would not venture to consult any skilful person, or would only dare to tell his counsel half his case.” The learned chancellor then proceeds to state the apparent exceptions to the rule (none of which apply to this case), and thus continues: “ In all such cases, it is plain that the *839 attorney is not called upon to disclose matters which he can be said to have learned by communication with his client or on his client’s behalf, matters which were so committed to him in his capacity of attorney, and matters which, in that capacity alone, he had come to know.” He then adverts to the cases which support the rule, and those which come under the apparent exceptions thereto; but it is- unnecessary to notice them here, or to make any further extracts from his opinion, so much of which has already been set forth as showing more clearly than can be found elsewhere, the true exposition of the rule in question.
And now let us see whether and how far that rule applies to this case. When the communication sought to be introduced ¿as evidence was made, Chahoon, Sands, .and Sanxay were all under a joint indictment for con•spiracy to defraud the estate of Haunsteiu, and also under several indictments for the forging and uttering of a paper named in the indictment in this case. Under ■such circumstances, it was natural and reasonable, if not necessary, that these parties, thus charged with the •same crimes, should meet together in consultation with ■their counsel, communicate to the latter all that might be deemed proper for them to know, and to make all -necessary arrangements for the defence. Accordingly, :such a meeting and consultation were had in the office of Sands, one of the accused. There were present at that meeting all three of the accused, Cbahoon, Sands and Sanxay ; and John M. Gregory, counsel representing Sands, and John Lyon, counsel representing Sanxay. The couusel of Chahoon was absent. It does not appear that any other person was present on the occasion than those above named, and it may well be inferred that there was not. How nothing can be more certain than that, according to all the authorities on the subject, whatever either of the counsel present heard, or saw, on the said occasion, concerning the matter of the said *840 °harSe’ was a PrivileSed communication, within the meaning of the rule. Nothing can be more certain than that if John M. Gregory or John Lyon had been put upon the witness' stand by the Commonwealth, and called on to testify as to any thing said or done at that consultation, in regard to the subject matter of the charge, he would not have been compelled, or even allowed by the court to give such testimony, at least without the consent of his client. This proposition will hardly, and certainly cannot successfully, be denied. Then, if Lyon had been put upon the stand by the Commonwealth instead of by Chahoon, and asked what reply Chahoon gave to a question put to him by Sanxay or) the occasion aforesaid, and if Lyon had insisted, as he did, “that the knowledge and facts coming.to him in .said conference, and the reply to said question came in the interview aforesaid, while he represented Sanxay as counsel, and that he considered all that passed there as passing under the seal of professional confidence, and that he claimed the privilege of counsel, and declined to answer the said question, unless released from his obligation by said Sanxay,” it is perfectly certain that he would not have been compelled, or even allowed, to make such disclosure, without such a release.
How does the case differ when Lyon is put upon the stand by Chahoon, instead of the Commonwealth, and asked, “ what response the accused gave to the question of said Sanxay, and whether he did not make a reply different from that testified to by said Sanxay ?”
The only ground for any such difference must consist in the view, that the privilege in question is that of the client and not the counsel, and may therefore be released by the client; that Lyon was the counsel of Sanxay only in this matter ; and that Sanxay released the privilege, by himself testifying that in the conference aforesaid,. “ the accused had been asked by him (Sanxay) whether' he intended to deny that he had received the money *841 receipted for in the receipt given to said commissioner, and the accused replied that he had not and would not deny it.
Undoubtedly the privilege in question is that of the client, and not the counsel, aud the client may therefore release it. And the only question is, was the privilege released by the client in ths case ?
This question depends upon two others : First, could Sanxay he regarded as the only client of Lyo.n, within the meaning of the rule, and under the circumstances of this case ; and, secondly, did Sanxay release the privilege by giving testimony as aforesaid ?
And first, could Sanxay he regarded as the only client of Lyon, within the meaning of the rule, and under the-circumstances of the case ?
A man may be the counsel of two or more parties, concerning the same subject matter, arid in all such cases confidential communications made to him by one or all of such parties, jointly or severally, in reference to such matter, are privileged, and the privilege can only be released by consent of all the parties ; the privilege being that of each and all of. thorn. If all of the parties in this case, Chahoon, Sands aud Sanxay, had employed Lyon as their counsel, there can he no doubt but that the privilege could not have been released by the consent of less than all. And can it make any difference in this case, that he was employed as counsel» alone by Sanxay ? The parties were jointly indicted for a conspiracy to commit a particular crime, and severally indicted for forging and uttering the same paper. They might have employed the same counsel, or they might have employed different counsel as they did. But whether they did the one thing or the other, the effect is-the same, as to their right of communication to each- and all of the couusel, and as to the privilege of such* communication. They had the same defence1 to make,, the act of one in furtherance of the conspiracy, being: *842 .^e ac^ a^> an<^ COULlse^ °f ea°h was iQ effect the counsel of all, though, for purposes of convenience, he employed and paid by his respective client. They had a right, all the accused and their counsel, to consult together about the case and the defence, and it follows as a necessary consequence, that all the information, derived by any of the counsel from such consultation, is privileged, and the privilege belongs to each and all of the clients, and cannot be released without the consent of all of them. Otherwise what would such right of consultation be worth ?
Then Sanxay would have had no right to release the privilege, even if he had intended to do so, without the consent of Sands, and it is not pretended that Sands gave any such consent, and it is very certain that he did not.
But Sanxay, certainly, never, expressly, gave such consent, and did not intend to do so. On the contrary he, in effect, refused to do so. Lyon considered all that .passed at the meeting, as passing under the seal of professional confidence, claimed the privilege of counsel, and declined to answer the question propounded to him by the accused, unless released from his obligation by said Sanxay. And Sanxay did not give such release.
Secondly. Bid Sanxay release the privilege by giving testimony as aforesaid ? If he did, the release was by ■'implication only; and we would have a singular instance of an implication in the face of express evidence of a contrary intention. But hi3 merely giving testimony =as aforesaid, would not have operated as such a release 'by implication, even without any evidence of a contrary •intention. It does not appear that he was a voluntary witness ; on the contrary it appears that he was called by the Commonwealth. It is, perhaps, not even yet a settled question, whether he had a right to refuse to give ■testimony, in such a case. Admitting that he had ; still Le may not have been, and probably was not, aware of *843 his right, hut supposed that he was bound to give testimony. An intention to release the privilege ought to be expressed ; or, if implied, the implication ought to plain. The accused cannot complain that Sanxay was allowed to give testimony and Lyon not. Lyon found his way into that meeting, only under the seal of professional confidence. It was the interest of the accused, as ■well as that of his associates in the charge, that he, Lyon, should enter only in that way. As to giving testimony of what transpired there, he is to be considered as having been absent on the occasion. Suppose he had been absent, and no counsel of any of the parties had been present; would the accused have been any worse off’ than he now is ? Could he have then complained that Sanxay was allowed to give testimony of what occurred when there was no person present to contradict him ?
We see nothing in any of the cases referred to by the counsel of the plaintiff in error, which is at all in conflict with the views we have expressed, and we will not prolong this opinion by reviewing them. The rule stands unchallenged by any of them, that confidential communications from client to counsel, during the existence of this relationship, and about a professional matter, are privileged ; and the most that any of those cases can show is, what Lord Brougham calls an apparent, not a real, exception to the rule ; that is, that in that case, the relationship between counsel and client did not exist, or the communication was not confidential, or was not about a professional matter; none of which categories can be predicated of this case.
We are therefore of opinion that the testimony of John Lyon, as rebutting evidence to the testimony of R. S. Sanxay, was not improperly excluded.
But suppose the testimony of Lyon was admissible, was the accused prejudiced by its exclusion ? We think not. If Lyon had testified that the accused answered *844 Sanxay’s question as Sanxay says he did, then the testiwould only have been confirmatory of Sanxay’s,. an^ of course would have done the accused no good. If, on the other hand, Lyon had testified that the accused answered the question differently, and denied that he had received the money according to the terms of his receipt to the commissioner,' we can very well see how that answer might have prejudiced Sands and Sanxay,. but we cannot see how it possibly could have benefitted the accused. On the contrary, we think it would have prejudiced him also, by showing that the transaction-was not real, as his receipt represented it to be, hut fictitious and false, and an imposition upon the court. The actual receipt of the money was not a necessary ingredient of the offence, and no more such an ingredient (if so much) than the feigued and fictitious receipt of it. Then, in that view, ought this court to reverse this judgment on that ground, and remand the cause for a new trial, when there have already been three trials of it, and when the accused has been twice convicted by the verdict of a jury? If it appeared that an error was committed by the court below which may have prejudiced the accused, then he -is entitled to a reversal of the judgment, however often he may have been tried, and whatever amount of trouble and expense his repeated trials may-have occasioned. But if it be manifest that, even supposing the court below to have erred, yet the accused has-not been prejudiced, we think the Commonwealth ought not to be further burdened and the public longer wearied by this prosecution, but that it ought now to be ended.. ¥e are told that the last jury which tried the case, though they found the accused guilty, yet fixed the term of' his imprisonment in the penitentiary at the lowest period which the law authorized, and “ recommended him to-the mercy of the governor for executive clemency,” in-the exercise of the constitutional power of pardon. It will be for the governor to act upon that recómmenda *845 tion according to Ms sense of duty. It was not intended to have, and cannot have, any effect upon us. It is duty to decide the case according to law, and we have endeavored to do so.
"We are of opinion that there is no error in the judgment, and that it be affirmed.
Staples, J.,
thought that the witness Lyon should Lave been compelled to answer the question put to Mm. He concurred in the opinion of Moncure, P., on the other questions in the cause. °
Judgment aeeirmed.